**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

RONALD E. MCBRIDE, III,

     Petitioner,

v.                                 Case No. 8:25-cv-2865-WFJ-LSG

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## <u>ORDER</u>

Ronald E. McBride, III, a Florida prisoner, initiated this action by filing a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Docs. 1, 2, 7). Respondent filed a response opposing the petition. (Doc. 14). Although afforded the opportunity, Mr. McBride did not submit a reply. After careful review, the petition is **DENIED**.

## I.    Background

In the fall of 2014, K.F. moved to Florida and began working as an emergency-room nurse at Sarasota Memorial Hospital. (Doc. 15-2, Ex. 7, at 204). She "fell into" drug addiction, lost her job in February 2015, and became homeless in May 2015. (*Id.* at 205). Around the end of September 2015, K.F. began to engage in prostitution via Backpage, a website "where individuals [could] find . . . an escort." (*Id.* at 209, 297). She stopped prostituting herself by the end of October 2015. (*Id.* at 297).

The next month, K.F. met Mr. McBride outside a Salvation Army building in Sarasota. (*Id.* at 206). By November 15, 2015, the two had become romantically involved.

(*Id.* at 208). Soon after, Mr. McBride suggested that K.F. could make "easy money" by engaging in prostitution along U.S. Highway 41. (*Id.* at 209-10). She was "terrified" of the prospect, but Mr. McBride said "he would look out for [her]" and "make sure nothing would happen to [her]." (*Id.* at 210). He also gave her "guidelines . . . to follow," including prices for various sex acts, the ideal times to "walk" on U.S. 41, and how to tell when a driver was "interested" in hiring her. (*Id.* at 211-13). After every encounter with a customer, K.F. would give Mr. McBride the money she had made. (*Id.* at 217). He used the money to buy drugs for both of them. (*Id.* at 217-19).

Around Thanksgiving, Mr. McBride became "physically violent" toward K.F. (*Id.* at 219). If K.F. returned from a customer with less money than Mr. McBride wanted, he would order her to "get to [her] knees." (*Id.* at 220-21). If K.F. failed to comply, Mr. McBride would hit her knees and "slap" her. (*Id.* at 221). Once she was on her knees, Mr. McBride would "spit in [her] face" and say that she "better not be holding onto the money." (*Id.*) On one occasion, Mr. McBride "threw a plate of food at [K.F.'s] face" and told her she "need[ed] to go walk" on U.S. 41. (*Id.* at 222). On another occasion, K.F. went to a house to buy drugs and saw Mr. McBride. (*Id.* at 242). He "pinned [her] up against the back of the house," accused her of being "disloyal," and said she was "stealing from him" by purchasing drugs "behind his back." (*Id.* at 242, 244). Throughout this time, Mr. McBride threatened to "beat" K.F. and "have people come after" her. (*Id.* at 224).

On the morning of December 29, 2015, K.F. and Mr. McBride woke up at a "frisbee park" in Sarasota. (*Id.* at 251). Mr. McBride was "starting to feel some symptoms of withdrawal," and he "didn't have as much heroin left as he thought that he did." (*Id.*) He

accused K.F. of stealing heroin and told her to "go suck a dick for $60 and bring it back to him." (*Id.* at 251-52). K.F. said no, which made Mr. McBride "more upset and enraged." (*Id.* at 252). He chased her out of the park and told her "not to come back until [she] had the money." (*Id.* at 253). K.F. engaged in prostitution along U.S. 41 for "a few hours" before heading to a house where she frequently "bought drugs" and "[got] high." (*Id.* at 253-54).

Mr. McBride found K.F. outside the house and told her to "give him the money." (*Id.* at 258). When she said no, Mr. McBride pulled out a handgun, held it "in front of [her] face," and "demand[ed]" the money. (*Id.* at 259). She again refused, and Mr. McBride put the gun "back in his pants." (*Id.* at 259-60). He said he was "just kidding around, just trying to scare [her]," but he asked, "[D]o you have that money for me?" (*Id.* at 260). When K.F. still refused to give him the money, Mr. McBride pulled out the gun, "put it to the side of [her] head," and said that he "was going to shoot the gun next to [her] head so that [she] could hear it go off." (*Id.* at 262). He also loaded the gun and told her that "the next bullet was going to be in [her] head." (*Id.* at 262-63).

K.F. pleaded with Mr. McBride to "stop," and she tried to "walk away." (*Id.* at 264). He blocked her path. (*Id.*) In an attempt to find the money, Mr. McBride lifted K.F.'s shirt and bra. (*Id.* at 265). Finding nothing, he pulled down her pants and underwear and asked if she "had the money hidden inside [her] vagina." (*Id.* at 265-66). He placed his fingers inside her vagina but was unable to locate the money. (*Id.* at 266-67). K.F. pulled her pants back up and tried to "get away." (*Id.* at 267). Mr. McBride grabbed K.F.'s purse, causing her to fall to the ground. (*Id.*) He dragged her "through the dirt" and pistol-whipped her in

3

the "legs" and "arms." (*Id.* at 267-68). Mr. McBride finally got hold of the bag and emptied it out on the ground. (*Id.* at 268). K.F. ran toward U.S. 41, leaving behind one shoe that contained $406 in cash. (*Id.* at 268-69).

Mr. McBride was arrested and charged with sexual battery with a firearm, robbery with a firearm, aggravated battery with a deadly weapon, false imprisonment, and human trafficking. (*Id.*, Ex. 5). The case went to trial. (*Id.*, Ex. 7). Mr. McBride was found guilty as charged, and he received a total sentence of fifty years' imprisonment. (*Id.*, Ex. 9; Doc. 15-3, Ex. 17). Mr. McBride was twenty-three years old at the time of sentencing. (Doc. 15-2, Ex. 3, at 1; Doc. 15-3, Ex. 17). Following an unsuccessful direct appeal, Mr. McBride sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 15-3, Exs. 23, 35). The postconviction court denied relief, and the appellate court affirmed in an unexplained decision. (*Id.*, Exs. 36, 38, 41, 43, 48). This federal habeas petition followed. (Docs. 1, 2, 7).

## II.    Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The appellate court in Mr. McBride's case affirmed his convictions, as well as the denial of postconviction relief, without discussion. These decisions warrant deference

under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B.        Ineffective Assistance of Counsel

Mr. McBride alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. McBride must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Mr. McBride must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

6

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III.   Discussion[1]

### A.   Ground One—Failure to Inform Mr. McBride of Mandatory Minimum

Mr. McBride argues that trial counsel was ineffective for failing to inform him that he faced a fifty-year mandatory minimum sentence if convicted of sexual battery with a firearm. (Doc. 7 at 8). Under Florida law, "a person who qualifies as a dangerous sexual felony offender ["DSFO"] . . . must be sentenced to a mandatory minimum term of fifty years' imprisonment." Fla. Stat. § 794.0115(2). A person qualifies as a DSFO if he commits

---

[1] Mr. McBride's filings are not a model of clarity, but it appears that he intends to raise the ineffective-assistance claims asserted in his Rule 3.850 motion. (Doc. 7 at 8-45). The Court adopts the Rule 3.850 motion's numbering scheme for Mr. McBride's claims.

sexual battery and uses or threatens to use "a deadly weapon during the commission of the offense." *Id.* § 794.0115(2)(b). Mr. McBride alleges that counsel failed to inform him that he qualified as a DSFO and thus faced a fifty-year mandatory minimum. (Doc. 7 at 8). Had he received this information, he allegedly would have accepted the State's "favorable plea offer" of ten years' imprisonment. (*Id.* at 12).

The postconviction court held an evidentiary hearing on this claim. (Doc. 15-3, Ex. 39). Counsel acknowledged that he did not inform Mr. McBride about the mandatory minimum. (*Id.* at 9). Instead, he told Mr. McBride that the "highest sentence[]" he could receive was life imprisonment. (*Id.*) He also told Mr. McBride that if he was convicted of human trafficking, there was "a very good chance" that he would "go to prison for the rest of [his] life." (*Id.* at 22). Indeed, counsel informed Mr. McBride that he had seen the judge "sentence people to life almost every day." (*Id.* at 23). Nevertheless, Mr. McBride insisted on "going to trial," and he "never stated that he was willing to take a plea or . . . negotiate." (*Id.* at 14). Indeed, Mr. McBride refused to "waive a speedy trial." (*Id.* at 12). According to counsel, Mr. McBride believed that K.F. "was not going to show up" to trial, and that the State's "other witnesses"—homeless friends of Mr. McBride's who witnessed some of the charged conduct—"wouldn't show up" either. (*Id.* at 15, 20). Counsel told Mr. McBride that he could not "depend on witnesses not showing up," but "[a]ll he wanted to do was go to trial." (*Id.* at 21, 23).

Mr. McBride testified as well. He stated that he "rolled the dice" at trial because he thought "it would have been a credibility contest between [him]" and K.F., "two drug addicts." (*Id.* at 42). Mr. McBride also claimed that he thought the "judge would have had

8

the discretion to sentence [him] to" twenty years' imprisonment. (*Id.*) Indeed, Mr. McBride testified that he had appeared before the judge in other cases, and that he believed the judge would understand he was not "a pimp." (*Id.* at 44). According to Mr. McBride, had he known of the fifty-year mandatory minimum, he would have taken the ten-year plea offer. (*Id.* at 45). Mr. McBride acknowledged that, during a jail call after sentencing, he told his mother that he was "Gucci"—a slang term for "happy"—with the fifty-year sentence and with not receiving a life sentence. (*Id.* at 78). He also conceded that, before trial, he had told his mother during a jail call that he declined "any kind of deal because they know they ain't have no case." (*Id.* at 78-79).

The postconviction court ultimately rejected Mr. McBride's ineffective-assistance claim. (*Id.*, Ex. 41). It "found [his] testimony less than credible." (*Id.* at 3). The court pointed out that, although Mr. McBride claimed he "would have accepted a plea deal had he known of" the fifty-year mandatory minimum, he "acknowledged the [mandatory minimum] in his post-sentencing jail phone call and voiced his satisfaction with it." (*Id.* at 3-4). The court then explained that, to show prejudice from a lost plea offer, a defendant must "demonstrate a reasonable probability that" he "would have accepted the offer had counsel advised the defendant correctly." (*Id.* at 4 (citation omitted)). The court found no "reasonable probability that [Mr. McBride] would have accepted the [ten-year] offer had his counsel properly advised him that he faced a fifty-year minimum mandatory sentence." (*Id.*) According to the court, it "was clear from the evidence that there was nothing [counsel] could say or do to convince [Mr. McBride] to accept a plea deal." (*Id.* at 4-5). In the court's view, Mr. McBride "was convinced that the State would not be able to prove

the charges at trial and he was willing to take the risk even believing he likely would be sentenced to life if found guilty." (*Id.* at 5). Therefore, Mr. McBride failed to "meet his burden" of showing prejudice from counsel's failure to inform him of the fifty-year mandatory minimum. (*Id.*)

This ruling was reasonable. "[C]laims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland*." *Missouri v. Frye*, 566 U.S. 134, 140 (2012). To establish prejudice from a lost plea offer, the petitioner must show that, "but for the ineffective assistance of counsel, a reasonable probability existed that: (1) the plea offer would have been presented to the court (*i.e.* the [petitioner] would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances); (2) the court would have accepted its terms; and (3) under the offer's terms, the conviction or sentence, or both, would have been less severe than under the judgment and sentence that were, in fact, imposed." *Carmichael v. United States*, 966 F.3d 1250, 1259 (11th Cir. 2020). "Applying AEDPA to *Strickland*'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. McBride]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Mr. McBride cannot meet this demanding standard. The postconviction court found that Mr. McBride lacked credibility, accepting counsel's version of events instead. (Doc. 15-3, Ex. 41, at 3-4). "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for*

*Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). Mr. McBride has not shown by "clear and convincing evidence" that the court's credibility determination was erroneous. 28 U.S.C. § 2254(e)(1). Thus, he cannot overcome the "presumption of correctness" afforded that determination. *Consalvo*, 664 F.3d at 845.

Based on the postconviction court's reasonable determination of the facts, Mr. McBride suffered no prejudice from counsel's deficient performance. A fairminded jurist could agree that, even if Mr. McBride had known of the fifty-year mandatory minimum, there was no "reasonable probability" that he "would have accepted" the ten-year plea offer. *Carmichael*, 966 F.3d at 1259. Counsel told Mr. McBride that if he was convicted of human trafficking, there was "a very good chance" that he would "go to prison for the rest of [his] life." (Doc. 15-3, Ex. 39, at 22). Counsel also explained that the judge "sentence[d] people to life almost every day." (*Id.* at 23). Yet Mr. McBride insisted on "going to trial" and never expressed any willingness to "take a plea or . . . negotiate." (*Id.* at 14). Mr. McBride believed that—despite the likelihood of a life sentence following a conviction—he would be acquitted because K.F. and other key witnesses would not show up to trial. (*Id.* at 15, 20). Counsel said Mr. McBride should not count on "witnesses not showing up," but "[a]ll he wanted to do was go to trial." (*Id.* at 21, 23). Finally, during a post-sentencing jail call, Mr. McBride told his mother that he was happy with the fifty-year sentence, apparently because he had expected to receive life instead. (*Id.* at 78).

On this record, a fairminded jurist could agree that "there was nothing [counsel] could say or do to convince [Mr. McBride] to accept a plea deal." (*Id.*, Ex. 41, at 4-5). Therefore, the postconviction court reasonably concluded that Mr. McBride suffered no

11

prejudice from counsel's failure to inform him of the fifty-year mandatory minimum. *See Fisher v. Sec'y, Fla. Dep't of Corr.*, 616 F. App'x 916, 920 (11th Cir. 2015) (state court reasonably found no prejudice from failure to inform petitioner of thirty-year mandatory minimum because petitioner rejected fifteen-year plea offer despite knowing that "he could potentially be sentenced to 120 years if convicted [at trial]"); *Ambert v. Jones*, No. 4:16-cv-218-WS-EMT, 2018 WL 7150764, at *13 (N.D. Fla. Sept. 24, 2018) ("Petitioner was clearly unfazed by [counsel's] warning him that he believed the court would probably impose a life sentence if [he] was convicted at trial. So even if [p]etitioner had been advised that the lowest permissible sentence was twenty-five years, his testimony reasonably suggests he would . . . not have accepted a plea offer . . . ."), *adopted by* 2019 WL 400062 (N.D. Fla. Jan. 31, 2019).

### B.   Grounds Two and Three—Failure to Impeach K.F.

Mr. McBride faults trial counsel for failing to adequately impeach K.F. with "prior inconsistent statements." (Doc. 7 at 14-27). According to Mr. McBride, K.F. made inconsistent statements about (1) whether Mr. McBride "chased her out of" the frisbee park; (2) whether Mr. McBride brandished his handgun only after she refused to give him money or did so the "instant" he saw her; (3) whether she was "coerced" into signing a waiver of prosecution; (4) whether the $406 was in her shoe or her purse; (5) whether she or Mr. McBride was the first to flee the scene of the attack; and (6) whether she went looking for Mr. McBride after the attack. (*Id.*) According to Mr. McBride, counsel was deficient for failing to bring out these alleged inconsistencies. (*Id.* at 14, 24).

12

The postconviction court reasonably rejected this claim. (Doc. 15-3, Ex. 38, at 2-7). First, the court found that Mr. McBride "was not prejudiced by th[e] lack of impeachment" about whether he chased K.F. out of the frisbee park. (*Id.* at 3). As the court explained, K.F. testified at trial that after she "initially refused" to "prostitute herself" for drug money on the morning of December 29, 2015, Mr. McBride "physically chased her out of the park and told her not to return until she had the money." (*Id.* at 2). But in a "prior statement" to the police, K.F. said that "she did not respond to" Mr. McBride's "demand." (*Id.*) Instead, she "got upset and walked away." (*Id.*)

The court found that impeachment on this matter would have no "reasonable probability" of changing the outcome at trial because the "incident in the park was only a part of the State's evidence showing [Mr. McBride] coerced [K.F.] into prostitution." (*Id.* at 3-4). Specifically, the State proved (1) that Mr. McBride "would always hold the money as soon as he could get it from" K.F.; (2) that "he decided when [K.F.] ate and would refuse her requests for food and drink because he needed the money for other things"; (3) that he "ordered her to her knees, hit her knees, and spat in her face after she returned with less money than [he] expected"; (4) that he "threw a plate of food at [K.F.] while demanding she walk"; (5) that he "threatened to beat her, leave her, or get people to assault her"; and (6) that he once "pinned [K.F.] against the back of a house and yelled at her for not bringing his money and trying to purchase drugs on her own." (*Id.*) Given the "other evidence" that Mr. McBride used "threats, force, and control over [K.F.] in relation to prostitution and money demands," the court found "no reasonable probability" that the jury would have

13

acquitted Mr. McBride had counsel impeached K.F. about the frisbee-park incident. (*Id.* at 4).

This ruling was reasonable. The frisbee-park incident helped establish coercion, one of the elements of human trafficking. Under Florida law, human trafficking requires proof (1) that the defendant "knowingly, or in reckless disregard of the facts, engage[d] in, or attempt[ed] to engage in, or benefit[ed] financially by receiving anything of value from participation in a venture that [] subjected a person to human trafficking"; and (2) that the human trafficking involved the defendant's use of "coercion for commercial sexual activity." Fla. Stat. § 787.06(3)(b). "Human trafficking" means "transporting, soliciting, recruiting, harboring, providing, enticing, maintaining, or obtaining another person for the purpose of exploitation of that person." *Id.* § 787.06(2)(d). "Coercion" can be shown in several ways, any one of which is sufficient to support a conviction. *Id.* § 787.06(2)(a). As relevant here, coercion can mean "[u]sing or threatening to use physical force against any person." *Id.* § 787.06(2)(a)1.

Even apart from the frisbee-park incident, the State presented ample evidence that Mr. McBride used "coercion for commercial sexual activity." *Id.* § 787.06(3)(b). As noted above, the jury learned that Mr. McBride "ordered [K.F.] to her knees, hit her knees, and spat in her face after she returned with less money than [he] expected"; that he "threw a plate of food at [K.F.] while demanding she walk"; that he "threatened to beat her, leave her, or get people to assault her"; and that he once "pinned [K.F.] against the back of a house and yelled at her for not bringing his money and trying to purchase drugs on her own." (Doc. 15-3, Ex. 38, at 3-4). This evidence was independently sufficient to establish

14

that Mr. McBride used (and threatened to use) "physical force against" K.F. to further their "commercial sexual activit[ies]." Fla. Stat. § 787.06(2)(a)1. Thus, a fairminded jurist could agree that, even if counsel had impeached K.F. about the frisbee-park incident, there was no "reasonable probability" that "the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014).

Next, the postconviction court held that Florida law would have barred counsel from impeaching K.F. about when Mr. McBride brandished the gun. (Doc. 15-3, Ex. 38, at 5). The court noted that "impeachment on a collateral matter is generally impermissible," and that "[a] matter is collateral unless the testimony can be admitted for a purpose other than contradiction, specifically (1) facts relevant to a material issue and (2) facts evidencing a witness's bias, corruption, or lack of competency." (*Id.* at 3 (citations omitted)). At trial, K.F. testified that Mr. McBride "pulled a gun from his waist and pointed it at her" when she refused to give him the money she had made on U.S. 41. (*Id.* at 4). By contrast, "during a prior interview with law enforcement, [K.F.] stated [that Mr. McBride] had his gun out and was pointing it at her from the moment she saw him." (*Id.*) The court held that "impeachment on this collateral issue [was] impermissible." (*Id.* at 4-5). As the court noted, "the inconsistent statements . . . address[ed] whether [Mr. McBride] brandished his gun immediately or after the victim refused to give him money." (*Id.* at 5). But "the material aspect of this testimony [was] [Mr. McBride's] use of the gun in the commission of the offenses; whether he brandished it immediately upon seeing [K.F.] or only after she refused to give him money [was] immaterial." (*Id.*)

The court likewise held that counsel could not have impeached K.F. about (1) whether the $406 was in her shoe or her purse and (2) whether she or Mr. McBride was the first to flee the scene of the attack. (*Id.* at 5-6). K.F. "stated in a police interview that the money was in her bag, while at trial she testified that the money was in her shoe." (*Id.* at 5). The court ruled that "the relevant and material aspect of this testimony [was] that [Mr. McBride] was demanding money from [K.F.] and searching her person and belongings; whether the money was in her purse or her shoe [was] immaterial." (*Id.* at 5-6). Similarly, the court held that "whether [K.F.] fled before or after [Mr. McBride] [was] immaterial to the charges and issues in this case." (*Id.* at 6). Therefore, counsel could not have impeached K.F. on these collateral issues.[2] (*Id.* at 5-6).

As for the waiver of prosecution, the court held that counsel could not have impeached K.F. on this matter because her prior statements were consistent "with her trial testimony." (*Id.* at 5). At trial, K.F. "testified that she submitted a request not to prosecute" because "people on the street were calling her a snitch and asking why she was keeping [Mr. McBride] in jail, and she wanted a copy of the waiver as proof that she was not keeping him in jail." (*Id.*) The waiver of prosecution itself, however, stated that K.F. "was not being threatened or coerced to sign" it. (*Id.*) The court held that "the waiver language [was] not inconsistent with [K.F.'s] trial testimony" because she "testified [at trial] that she

---

[2] The court also noted that although K.F.'s "statement to police [was] inconsistent regarding who fled the scene first," her "deposition testimony [was] not inconsistent with her trial testimony, as both reflect[ed] [K.F.] leaving first." (Doc. 15-3, Ex. 38, at 6). Therefore, the court held, counsel could not have impeached K.F. with her deposition testimony. (*Id.*)

16

was being threatened in general related to [Mr. McBride's] charges and incarceration, not that she was being threatened or coerced to sign the waiver." (*Id.*)

These rulings—that counsel had no legal basis to impeach K.F. in the proposed manner—rested on the postconviction court's interpretation of Florida law. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Such deference is required here. The postconviction court held that, as a matter of Florida law, the proposed impeachment was impermissible because it concerned collateral issues or involved testimony that was not inconsistent. (Doc. 15-3, Ex. 38, at 5-6). Thus, the postconviction court "already has told us how the issues would have been resolved under Florida state law had [counsel] done what [Mr. McBride] argues he should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). That determination is binding on federal habeas review. *See Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1352 (11th Cir. 2024) (federal court owes "unconditional deference to a state . . . court's decision of a state-law issue in a federal habeas case"); *Morales v. Sec'y, Dep't of Corr.*, No. 8:21-cv-1846-MSS-TGW, 2024 WL 3540328, at *28 (M.D. Fla. July 25, 2024) ("Whether trial counsel could have impeached Detective Cruz with his deposition testimony about the eyeglasses is an issue of state evidentiary law, and a state court's determination of state law receives deference in federal court.").[3]

---

[3] *See also Miller v. Sec'y, Dep't of Corr.*, No. 8:17-cv-2815-TPB-AEP, 2020 WL 7318967, at *34 (M.D. Fla. Dec. 11, 2020) ("Whether [a witness's] statement[s] to police [were] [] prior inconsistent statement[s]

Even if deference were not mandatory, Mr. McBride's claim would still fail. The discrepancies he highlights—for example, whether the $406 was in K.F.'s shoe or her purse—are relatively minor and do not undermine the core of her testimony. A petitioner cannot show deficient performance or prejudice based on counsel's failure to highlight slight discrepancies in a witness's statements. *See Calder v. Dixon*, No. 23-cv-60762, 2023 WL 8719158, at *13 (S.D. Fla. Dec. 18, 2023) (rejecting ineffective-assistance claim because petitioner could not show that counsel's "decision not to impeach [a witness] on this minor inconsistency would've had any effect on the jury's verdict"); *Wilson v. Sec'y, Dep't of Corr.*, No. 6:10-cv-422-CEH-KRS, 2013 WL 1499549, at *7 (M.D. Fla. Apr. 12, 2013) ("Petitioner has not demonstrated that counsel was deficient for failing to impeach [a witness] on minor inconsistencies that did not completely contradict her trial testimony and could easily be attributed to the lapse of time or differences in the manner she was questioned and recounted the events.").

Lastly, the postconviction court reasonably rejected Mr. McBride's claim that counsel "was ineffective for failing to properly impeach [K.F.] with a prior inconsistent statement about looking for [Mr. McBride] after the attack." (Doc. 15-3, Ex. 38, at 6). As the court pointed out, K.F. "made a statement to [law enforcement] to the effect that she

is an issue of state law, and a state court's determination of state law receives deference in federal court."), *aff'd*, No. 21-10077, 2022 WL 3452468 (11th Cir. Aug. 18, 2022); *Cano v. Sec'y, Dep't of Corr.*, No. 8:17-cv-2436-TPB-JSS, 2020 WL 6134225, at *18 (M.D. Fla. Oct. 19, 2020) ("Whether the impeachment concerned a collateral matter is an issue of state law, and a state court's determination of state law receives deference in federal court."); *Batista v. Dep't of Corr. & Att'y Gen.*, No. 6:17-cv-748-GKS-GJK, 2018 WL 11224336, at *7 (M.D. Fla. May 14, 2018) (deferring to state court's determination that "some of the discrepancies in [the witness's] testimony were collateral and any impeachment would have been merely for the purpose of contradiction").

18

was looking for [Mr. McBride] after the attack, contrary to her initial trial testimony that she was not looking for him." (*Id.* at 7). On cross-examination, K.F. "recognized the statement when trial counsel presented it to her for review, and she offered testimony explaining what she meant by the prior statement." (*Id.*) Specifically, she claimed that she "was incidentally looking for [Mr. McBride] while doing other things and was not 'in pursuit' of him." (*Id.* at 6 (citation omitted)). The jury "was ultimately informed that [K.F.] made a prior statement inconsistent with her trial testimony that she was not looking for [Mr. McBride], prompting [her] to walk back her initial denial and concede that she was, in some sense or to some extent, looking for [him]." (*Id.* at 7; *see also* Doc. 15-2, Ex. 7, at 323-27). Thus, the court correctly held that Mr. McBride suffered no prejudice because the jury knew "that [K.F.] made a previous statement that she was looking for [Mr. McBride]." (Doc. 15-3, Ex. 38, at 7).

    **C.    Ground Four—Failure to Request Jury Instruction on Lesser-Included Offense**

Mr. McBride contends that trial counsel should have requested a jury instruction on "deriving support from the proceeds of prostitution" as a lesser-included offense of human trafficking. (Doc. 7 at 27). The postconviction court rejected this claim, holding that "a request for this instruction would have been meritless." (Doc. 15-3, Ex. 36, at 4). The court explained that, under Florida law, "the offense of deriving support from the proceeds of prostitution requires a defendant 'with reasonable belief or knowing another person is engaged in prostitution to live or derive support or maintenance in whole or in part from what is believed to be the earnings or proceeds of such person's prostitution.'" (*Id.* (quoting

Fla. Stat. § 796.05(1))). Here, the charging information "alleged [that Mr. McBride] 'benefitted financially by receiving [something] of value'" from human trafficking, but it did not plead that Mr. McBride "lived or derived support or maintenance in whole or in part from proceeds of another's prostitution." (*Id.* (citation omitted)). Thus, because the information did not "allege[] the necessary statutory elements" for deriving support from the proceeds of prostitution, counsel had no legal basis to request an instruction on that offense. (*Id.*)

This ruling "turn[ed] on [an issue of] state law"—whether Mr. McBride was entitled to an instruction on deriving support from the proceeds of prostitution. *Pinkney*, 876 F.3d at 1295. Therefore, this Court is bound by the postconviction court's determination that Florida law forbade the instruction. *See Sandoval v. Sec'y, Dep't of Corr.*, No. 8:09-cv-1528-SDM-MAP, 2012 WL 4760933, at *7 (M.D. Fla. Oct. 5, 2012) ("The post-conviction court determined that state law precluded presenting jury instructions on lesser-included offenses. A federal district court must defer to the state court's application of state law."). Because a request for the instruction would have been denied, the postconviction court reasonably concluded that counsel was not deficient. *See Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

### D.    Ground Five—Failure to Object to Jury Instructions

Mr. McBride faults trial counsel for failing to object to the jury instructions on robbery with a firearm. (Doc. 7 at 30). According to Mr. McBride, the instructions "omitted

20

an essential element of the charged offense"—whether the defendant "used or possessed an actual firearm" during the robbery. (*Id.* at 31).

The postconviction court correctly rejected this claim. (Doc. 15-3, Ex. 36, at 5). As it explained, "in conformance with the standard jury instructions, the [trial court] . . . instruct[ed] the jury to find [Mr. McBride] guilty of robbery with a firearm upon finding he carried a firearm in the course of committing the robbery." (*Id.*) Specifically, the jury was told that "[i]f you find [Mr. McBride] guilty of the crime of robbery, then you must further determine beyond a reasonable doubt if in the course of committing the robbery [he] carried some kind of weapon. . . . If you find that [he] carried a firearm in the course of committing the robbery, you should find him guilty of robbery with a firearm." (Doc. 15-2, Ex. 7, at 593-94). These instructions were substantively identical to Florida's standard jury instructions on robbery with a firearm. *See* Fla. Std. Jury Instr. 15.1 (Crim.). "[C]ounsel's failure to object to the use of these standard jury instructions was not deficient performance." *Bilotti v. Fla. Dep't of Corr.*, 133 F.4th 1320, 1336 (11th Cir. 2025).

### E.      Ground Six—Failure to Object to Verdict Form

According to Mr. McBride, counsel should have objected to the verdict form because it lacked a "separate interrogatory" asking whether he "used or possessed an actual firearm during the . . . commission of sexual battery." (Doc. 7 at 35). Below is the relevant portion of the completed verdict form:

We, the jury, find as follows as to Count 1:  (check one only)

_____✓_____ a.    The defendant is guilty of Sexual Battery with a Firearm, victim 12 or older, as charged.

_____ b.    The defendant is guilty of Sexual Battery with a Deadly Weapon, a lesser included offense.

_____ c.    The defendant is guilty of Sexual Battery, a lesser included offense.

_____ d.    The defendant is guilty of Battery, a lesser included offense.

_____ e.    The defendant is not guilty.

(Doc. 15-2, Ex. 9). Mr. McBride contends that, had the form included a separate interrogatory on possession or use of a firearm, "the jury may have decided [he] did not use or possess an actual firearm" during the sexual battery. (Doc. 7 at 38).

The postconviction court correctly rejected this claim for lack of prejudice, finding "no reasonable probability that requesting a special firearm finding for the sexual battery count would have changed the outcome of the trial." (Doc. 15-3, Ex. 36, at 6). As the court explained, the jury "was properly instructed on the elements of sexual battery . . . and given definitions for 'deadly weapon' and 'firearm.'" (*Id.*; *see also* Doc. 15-2, Ex. 7, at 591-95). Moreover, the "verdict clearly reflect[ed] a finding that" Mr. McBride "us[ed] or threaten[ed] to use a firearm in the process of committing the sexual battery." (Doc. 15-3, Ex. 36, at 6). Additionally, "the sexual battery was committed during the same confrontation that began with [Mr. McBride] pointing a gun toward [K.F.] while demanding money and ended with the aggravated battery and robbery." (*Id.*) The verdict "on the aggravated battery also reflect[ed] a determination that [Mr. McBride] used a deadly weapon with a special finding that he carried a firearm, the only deadly weapon

22

alleged in the charging document or implicated by the evidence." (*Id.*; *see also* Doc. 15-2, Ex. 9). On this record, there is no reasonable probability that, had the verdict form included a separate interrogatory, the jury would have "decided [Mr. McBride] did not use or possess an actual firearm" during the sexual battery. (Doc. 7 at 38).

F.      **Ground Seven—Failure to Object to Charging Information**

Mr. McBride contends that trial counsel was ineffective for failing to argue that the charging information was "fundamentally defective." (Doc. 7 at 38-39). According to Mr. McBride, the information failed to "charge human trafficking" because it omitted the "reckless disregard" element. (*Id.*) As relevant here, human trafficking requires proof that the defendant "*knowingly, or in reckless disregard of the facts*, engage[d] in, or attempt[ed] to engage in, . . . a venture that [] subjected a person to human trafficking." Fla. Stat. § 787.06(3)(b) (emphasis added). As Mr. McBride points out, the information alleged only that he "knowingly" committed the offense conduct. (Doc. 15-2, Ex. 5). It did not plead that he acted "in reckless disregard of the facts." (*Id.*) In Mr. McBride's view, counsel should have argued that the information was "fundamentally defective" because it lacked "allegations of . . . an essential element" of human trafficking. (Doc. 7 at 40).

The postconviction court held that counsel did not provide ineffective assistance. (Doc. 15-3, Ex. 36, at 6). The court noted that "[t]he offense of human trafficking provides alternative *mens rea* elements: that the defendant acted knowingly or in reckless disregard for the truth." (*Id.*) Moreover, although Florida law allows "the State to make disjunctive or alternative allegations for offenses that can be committed in several ways, the State is not prohibited from alleging only one manner of committing the offense." (*Id.*) Because

23

the information "was not defective or objectionable for omitting the alternative 'reckless disregard'" element, counsel had no obligation to raise the issue. (*Id.*)

This ruling "turn[ed] on [an issue of] state law"—whether the information adequately charged Mr. McBride with human trafficking. *Pinkney*, 876 F.3d at 1295. The postconviction court answered that question in the affirmative, holding that the information was not defective simply because it omitted one of two "alternative *mens rea* elements." (Doc. 15-3, Ex. 36, at 6). That determination is binding on federal habeas review. *See Kennedy v. Crews*, No. 3:12-cv-243-LC-CJK, 2014 WL 1632252, at *23 (N.D. Fla. Mar. 18, 2014) ("[T]his court will not 'second guess' the Florida state courts' conclusion that the information met the requirements of Florida law."), *adopted by* 2014 WL 1613933 (N.D. Fla. Apr. 21, 2014). Therefore, the postconviction court reasonably concluded that counsel did not provide ineffective assistance by failing to raise Mr. McBride's meritless objection. *See Holt v. Sec'y, Dep't of Corr.*, No. 8:19-cv-2730-SDM-TGW, 2023 WL 2044771, at *23 (M.D. Fla. Feb. 16, 2023) ("Whether the indictment alleged sufficient facts to charge a crime is an issue of state law, and a state court's determination of state law receives deference in federal court.").

Deference aside, Mr. McBride cannot show that the information was "fundamentally defective." (Doc. 7 at 40). "A criminal information is fundamentally defective only where it totally omits an essential element of the crime or is so vague, indistinct[,] or indefinite that the defendant is misled or exposed to double jeopardy." *Perley v. State*, 947 So. 2d 672, 674 (Fla. 4th DCA 2007). However, "the failure to include an essential element of a crime does not necessarily render an [information] so defective

24

that it will not support a judgment of conviction when the [information] references a specific section of the criminal code which sufficiently details all the elements of the offense." *DuBoise v. State*, 520 So. 2d 260, 265 (Fla. 1988).

Here, the information cited Fla. Stat. § 787.06(3)(b), the statute criminalizing human trafficking. (Doc. 15-2, Ex. 5). Section 787.06(3)(b) "sufficiently details all the elements of the offense," *DuBoise*, 520 So. 2d at 265, including the requirement that a defendant act "knowingly" or "in reckless disregard of the facts." Fla. Stat. § 787.06(3)(b). Thus, "[b]y referencing [§ 787.06(3)(b)], which specifically defines all the elements of the offense, the [information] placed [Mr. McBride] on adequate notice of the crime being charged." *Fulcher v. State*, 766 So. 2d 243, 245 (Fla. 4th DCA 2000); *see also Blake v. Jones*, No. 17-cv-80573, 2018 WL 11229859, at *7 (S.D. Fla. May 18, 2018) (finding that information was not fatally defective because it "specifically referenced the statutory section that included the necessary elements of the offense and put the petitioner on notice of those elements"), *adopted by* 2018 WL 11229858 (S.D. Fla. June 21, 2018). Because the information was not fundamentally defective, counsel had no obligation to raise Mr. McBride's meritless objection.

### G.     Ground Eight—Cumulative Error

Finally, Mr. McBride argues that trial counsel's "errors and omissions, considered cumulatively, [were] . . . serious enough to render his defense services constitutionally ineffective." (Doc. 7 at 43). "Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't*

25

*of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail,"

however, where none of the "individual claims of error" has "any merit." *Morris v. Sec'y,*

*Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Because each individual claim of

error lacks merit, Mr. McBride cannot show cumulative prejudicial effect.

## IV.    Conclusion

Accordingly, the Court **ORDERS**:

1. Mr. McBride's petition (Docs. 1, 2, 7) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. McBride and to **CLOSE** this
   case.

3. Mr. McBride is not entitled to a certificate of appealability. A prisoner seeking a
   writ of habeas corpus has no absolute entitlement to appeal a district court's denial
   of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . .
   . only if the applicant has made a substantial showing of the denial of a constitutional
   right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. McBride
   must show that reasonable jurists would find debatable both the merits of the
   underlying claims and the procedural issues he seeks to raise. *See Slack v.*
   *McDaniel*, 529 U.S. 473, 484 (2000). Mr. McBride has not made the requisite
   showing. Because Mr. McBride is not entitled to a certificate of appealability, he is
   not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on May 21, 2026.

_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

26